Curia, per
Butler, J.
I do not consider it necessary to consider this case in the many different points of view in which it was presented by the defendant’s counsel. I shall assume many principles that have been brought into the discussion, as they have been too long settled by judicial decisions to be fairly the subject of controversy at this time. There is now no difference between the undertaking to be answerable for the debt, default, and miscarriage of a third person, whether it be made before or after the transaction out of which the debt of the party promised for arises. If the promise or undertaking be collateral, and made at the creation of the debt, or after its admitted existence, but be founded on the continuance of the debt itself, it must be in writing. When the promise is made upon a new consideration, and upon the discharge of the primary debtor, it may be regarded as an original promise, and good without writing. Consideration and writing must both concur to make a collateral promise good within the 4th section of the Statute of Frauds. Writing is absolutely necessary, and cannot be dispensed with, whilst the consideration need not always be expressed, but may be proved by parol. Tyler vs. Givens, 3 Hill. A promise to answer for the debt of a third person may be founded on a sufficient consideration, and prospective guarantees generally imply a consideration, but would be void by the statute, unless in writing; as much, so as it would have been at common law without consideration. Nor can the fact of consideration alone make such an undertaking original and not collateral. A. may say to B. I will be answerable for the debt of C., upon a very good consideration, still he would not be bound by his verbal promise, so long as A. may hold C. liable on his original contract. Nor would the case be altered where A. says- to B., Deliver goods to C. and I will see that he pays you; although it should appear that A. had abundant consideration for his promise, and had thereby acquired a great pecuniary advantage. In both cases the question would be, did B. look to C. at all for the payment of his debtFor if he did, which must depend on circumstances, he cannot look to both for the *8 payment of the same demand, without the promise being reduced to writing. The credit to A. would make him alone responsible.
How stands the case before the court, when considered in reference to the above principles? When Simpson endorsed Milton’s paper, did he do so on Milton’s credit at all; or did he look wholly to Nance for his indemnity, on the verbal guaranty of the latter? It certainly cannot be questioned but that Simpson might have taken up the bill, upon the failure of the acceptors to pay it, or the drawers to accept it; and that he would then have had a right to look to Milton, the drawer, for his indemnity. Milton could not have escaped from his legal liability. In an action of indebitatus assumpsit, the plaintiff, Simpson, could have recovered from him the amount of the debt, as for so much money paid, laid out and expended for his use. In the case of Matson vs. Wharam, 2 T. R. 80, Mr. Justice Buffer laid down the rule as to the liability of the person for whom the promise is made, thus: — “The general line now taken, is, that if, the person for whose use the goods are furnished be liable at all, any other promise by a third person to pay that debt must be in writing, otherwise it is void by the Statute of Frauds.” Had Nance, by any inducement which he might have held out — such as Milton’s abundant means — prevailed on the bank to lend the money on Milton’s bill without endorsement, or written guaranty, would he have been liable to the bank for the default of Milton, by virtue of any verbal assurance on his part? In such a case, Milton would have been both primarily and exclusively the debtor of the bank by the terms of the paper itself; and it would have had no right to. look to Nance for indemnity on his verbal assurance. Milton’s liability to his indorser is but one degree removed from his liability to the bank. He and his endorser were both liable to the bank ; and the maker exclusively liable to the endorser upon, the payment of the debt by the latter, Simpson’s right to look to Milton in the first instance, would seem to be clear.
But it is said that this does not deprive him of his right to resort to Nance, the guarantor; provided he has shewn that,Nance was the party exclusively interested and benefited by the transaction in the bank. I can perceive no *9 good reason to authorize the conclusion that the bill was not discounted in bank for Milton’s benefit. It may have been to pay a debt to Nance himself, or for some other purpose. As the money was raised on his name, and in some measure on his credit, it may well be concluded that it was for his benefit, directly or indirectly. Nance's promise was connected with and entirely founded on Milton’s liability; that is, Nance was only bound to pay, according to his undertaking, on default of Milton.. Throughout the whole transaction, it is presupposed that Milton was liable on the bill, which would seem to imply that he was interested in having it discounted. How then can Nance’s undertaking be disconnected with it, and be placed on the footing of a new and original promise, founded on a personal consideration, in which he was alone interested 'l That cannot be the case, unless Nance had in’his hands some available means specifically set apart by Milton for the payment of the debt. For in that point of view Nance would have been accountable for the effects thus deposited, and would have been only paying his own debt, by his undertaking to be answerable for Milton’s liability. Under such circumstances, he would not be allowed to pocket the proceeds of the lumber without paying the debt in bank for which it was pledged. In effect it would be placing him in this' relation to Simpson by his promise— that is, of making himself Simpson’s unconditional debtor on the failure of the bill’s being paid when it became due. Nance may have used Milton’s name for the purpose of raising money for his own benefit, upon an understanding that he was to pledge Milton’s property to a third party, whose credit was to be made available in the transaction. With such an understanding, the party promising might be held liable on an independent promise, founded on a new and unconditional consideration — as in the case of McCray vs. Madden, 1 M’C. 487, defendant having assets in his hands for the purpose of paying plaintiff’s demand against another, promised, if plaintiff, who was about proceeding by attachment, would not take out an attachment, and would wait till fall, he would pay the debt, as he had assets in his hands for the purpose. In Olmstead vs. Greenly, 18 J. R. 42, A. deposi *10 ted a certain .sum of money and goods in B’s. hands, on an agreement that B. should pay a certain note endorsed by C. for A’s. accommodation, and indemnify B. against the note. This became B’s. own debt, by fair bargain. In Harrison vs. Sawtell, 10 J. R. 242, where A. being bound to indemnify B. in a certain suit in which he was arrested, requested C. to become special bail for B., and promised to indemnify him; it was held to be an original undertaking by A., and that C. was entitled to recover against him, &c. In all these cases, the party promising for a third person was entirely entrusted on his own' account, and being either accountable for the appropriation of the goods in his possession, or being bound to the extent of the party promised for. In both cases he was but promising to save himself from an existing liability, and not to answer for the debt of another. This view is well illustrated in the case of Perley vs. Spring, 12 Mass. R. 297. None of the cases go beyond this — that the effects must be placed in the hands of the guarantor, for the purpose of paying the particular debt in question. For a general liability to pay a debt for the party promised for, or having in possession goods without a special direction in relation to them, will not do — as appears well decided in the case of Delts vs. Park, reported by Fell, from New Jersey, 1 Southerland, 219. A. had become surety on a note of B’s., payable to C., which had been assigned to E. E. obtained judgment on it, and F. having property in his hands, refused to deliver it up to satisfy the judgment; but agreed 'with A. that he would pay the judgment. The confession of F. that he had property of B’s. in his hands was duly proved, but the promise being verbal, was held to be void by the statute. And there, the circumstance of F’s. having property of B’s' in his possession, made no difference in the case; it did not increase or create his liability to pay the debt, as it did not appear that the property of B. had been put into his hands for the purpose of paying the particular debt. But how can it be said that Nance had any of Milton’s property in his possession 'l The mills and lumber were his own, by virtue of a lease made several months before this contract was entered into, and without any reference to it. This liability was not then indicated, but seems to *11 have been one of the same date. In any view which we can take of this case, it presents a contract which comes within and is void by the 4th section of the statute of frauds — that is, it was a collateral contract by Nance, not in writing, to answer for the debt and default of Milton ; and we therefore think that the motion for non-suit should have been sustained. Motion granted.
O’Neall, Evans, Earle and Wardlaw, JJ. concurred.

Per

Richardson, J.
I think this was an original undertaking, on the part of Nance, to indemnify Simpson against the risk of his endorsing Milton’s order ; that such assurance on the part of Nance was for a valuable consideration ; and thaf'it is a mistake to suppose that Nance merely undertook to pay Simpson, upon Milton’s default; so as to bring the case within the 4th section of the Statute against Frauds. Nance had taken an assignment of Milton’s mills, to secure himself against liabilities for him; had worked them to advantage, and said he, Nance, carried the order of Milton to Simpson, to be endorsed by him, for discount. He induced him so to endorse, by saying, “ he had a large quantity of lumber in the creek; and as soon as he got a return from his factor, he would pay the note.” The case was not argued to the jury. But I deem it plain, that the order was to be discounted for Nance, who held it after the endorsement, and had said to Bobo, “if he got money that day he should have some.” I deem it also indicated by the evidence, and understood, that the lumber referred to was from Milton’s mills. If such were the facts, and whether, or not, they will probably be ascertained at the new trial ordered, Nance had two considerations for his promise to guarantee Simpson. First. — The receipt of the money discounted on the order, when endorsed by Simpson. Secondly. — Milton’s lumber, then in his hands. My understanding is, therefore, that Nance received a consideration from Simpson, i. e, the means of getting the order discounted, and turned into money for his own benefit, in return for his assurance that the order would be paid out of the proceeds of the lumber. Such a contract amounted to a lawful insurance, or contract of indemnity, *12 and steers clear of the true meaning of the Statute of Frauds ; although the result of the indemnity to Simpson, if fulfilled by Nance, enuring, as it would have done, to pay Milton’s order, would seem to make Simpson the surety of Milton, without a written undertaking. I am not, therefore, surprized, that a different view has been taken; and, perhaps, the safest way is to refer the case again to a jury. It certainly may have some evidence for their consideration, although if was submitted to the court as on a point of law alone.
(a) Elder vs. Warfield, 7 Har. and J. 391: Rogers vs. Kneeland, 13 Wend. 114: Anderson vs. Hoymon, 1 H. Bla. 120; Peckham vs. Faria, 3 Dougl. 13; 1 Saund. 211, a note. Cutler vs. Hinton, 6 Randolph, 509; Leland vs. Creyon, 1 M‘C. 100; Buckmyr vs. Darnell, 1 Salk. 27. Cases on collateral engagements within the Statute of Frauds.
“ The inquiry,” (says Mr. Chitty in his treatise on Contracts, p. 403,) “ in these cases must, therefore, be directed to this point, namely, whether amj credit was to be, or was, given to the third person; in other words,- whether he incurred awy responsibility to the creditor. This is a question depending not altogether on the particular woi-ds of the guarantee or promise of the defendant, but upon the particular circumstances of each case, and the general features of the transaction; and tire subsequent conduct of the creditor may be adduced in evidence to shew that he viewed the transaction, (it being of a dubious nature,) as one of guarantee only. As if the promise be, “you may send the goods to A., and I will take care the money shall be paid at the time;” here, assuming that the words prima fade import an original engagement, the creditor cannot treat it as such, if he has sent, a bill of parcels to A., charging him as the debtor; or has written letters to the defendant terming the promise a guarantee for A. See Rains vs. Stony, 3 C. & P. 181; Parsons vs. Walter, 3 Douglass, 14, note (c.) Keate vs. Temple, 1 B. & P. 158; Barker vs. Fox, 1 Starkie R. 270, in which A., an attorney, undertook and commenced certain business for B., but refused to proceed without a promise from C., to pay all further expense; it was held by Lord Ellenborough that this was the inchoate business and debt of another, and that C. was not liable on such a promise without a note in writing. Vide, Tileston vs. Nettleton, 6 Pick. 509; Kirkham vs. Martyn, 2 B. & A. B. 613. As .to the distinction between original and collateral undertakings, in reference to the Statute of Frauds, see the case of Corbet vs. Cochran, 3 Hill, 41.